In the Matter of VMS, AOS, SMS, EAS, and VLS, children under 18 years of age.

E.S. and M.S. [Parents], Appellants,

v.

BARTHOLOMEW COUNTY DEPART-
MENT OF PUBLIC WELFARE,
Appellee.

No. 1–1082A302.

Court of Appeals of Indiana,
First District.

March 24, 1983.

Stephen R. Heimann, Goltra & Heimann, Columbus, for appellants.

John A. Pushor, Lawson, Pushor, Mote & Coriden, Columbus, for appellee.

RATLIFF, Judge.

## STATEMENT OF CASE

Mr. and Mrs. S. (parents) appeal the Bartholomew County Juvenile Court's granting the Bartholomew County Department of Public Welfare's Petition to Terminate Parent-Child Relationship with respect to their five children. We affirm.

## FACTS

The record in this case commences with a Petition for Permanent Custody filed by DPW in 1978. Attached thereto is a certified report by the caseworker, Joshua Young, in which he stated that he visited the S. family at the request of Drs. Larson and Loheide. On May 25, 1978, they had requested DPW to inform Mr. and Mrs. S. of their daughter's [AOS's] appointment at Riley Hospital for a seizure disorder because the parents had a poor record of seeking medical attention. Mr. Young's report reads:

"A service case was reopened after contact with the [S.] family was made and treatment for [AOS] was initiated, due to the appalling living conditions of the family (dirt, clutter, inadequate shelter space and medical neglect). Since May this caseworker has worked with the [S. family], primarily on medical problems. During this time a medical appointment for [SMS] was not kept. Suggestions about immunizations for the children and prenatal care for Mrs. [S.] (who is about eight months pregnant) were rejected. During an ongoing service visit on July 7, 1978 evidence of extreme moral degeneracy was observed. Mr. [S.] showed Mr. Young part of a large collection of sexually explicit photographs he had taken. Mr. [S.] then presented his wife, naked, for Mr. Young to view. The children were present throughout the salacious display. Mr. [S.] stated that 'the children know about everything that goes on around here.' "

Record at 15–16. On July 13, 1978, the Bartholomew Juvenile Court made VMS, AOS, SMS, and EAS temporary wards of DPW. The department's Petition for Permanent Wardship was denied, however, and the children were ordered placed back with their natural parents under the supervision of DPW for six months. VLS was born September 13, 1978.

On May 2, 1979, all five children were made temporary wards of DPW upon the following certified report by caseworker, Joshua Young:

"Little progress has been made toward solving the identified problems [school attendance, medical care, financial problems, and alternative housing]. Mt. Healthy school officials have repeatedly reported attendance problems and a concurrent lack of cooperation on the part of the parents. [VMS] will be retained due to poor attendance. Efforts to enroll the young[er children] in special, remedial school programs have been largely ignored by the parents. The chil[dren] have visibly degenerated since being placed with their parents, but [Mr. and Mrs. S.] have declined to schedule medical checkups. Some medical follow-up appointments have been ignored. Others have been kept at the urging of the caseworker. Mr. [S.] has claimed from the outset that their move is imminent, but as yet he has not located another home.

Mr. [S.] terminated his employment at Cummins without making alternative financial arrangements. The township trustee complained to the caseworker about the inappropriateness of [Mr. and Mrs. Ss'] requests for financial aid. The [Ss'] landlady complained to the caseworker that the family has not paid rent for six months."

Record at 50–51. After yet another hearing the children were found to be neglected and dependent and were made permanent wards of DPW on September 18, 1979. On September 8, 1980, DPW filed a Petition to Terminate the Parent-Child Relationship. That petition was denied September 21, 1981. On March 26, 1982, DPW filed another Petition to Terminate the Parent-Child Relationship, and a hearing was held thereon June 9, 1982. On June 21, 1982, the court terminated parental rights in the five children with the following findings and order:

"1. On March 26, 1982, the Bartholomew County Department of Public Welfare filed a petition to terminate the parent-child relationship between the natural parents, [E.S.] and [M.S.], and [VMS] born December 10, 1971; [AOS] born March 12, 1973; [SMS] born March 13, 1975; [EAS] born July 29, 1976; and [VLS] born September 13, 1978.

2. The five above-mentioned children were made permanent wards of the Bartholomew County Department of Public Welfare on September 10, 1979.

3. The Bartholomew County Department of Public Welfare filed a petition to terminate parent-child relationship on September 8, 1980, which petition was denied on September 21, 1981.

4. The children have been out of the care and custody of the respondents, [E. and M.S.], for three years with the parents not having physical custody during that period of time, and the children have continually resided in foster care under the auspices of the Bartholomew County Department of Public Welfare since the date of the Permanent Wardship Order.

5. The parents have lived in a camper placed on the back of a pick-up truck for most of the immediate two-year period of time. The camper has a stove, bed, portable toilet, and one overhead light. [E.S.] has been and is currently pleased with the living arrangements in the camper and does not see the need to secure a house for living facilities for himself, his wife, and his children.

6. In 1979, [E.S.] voluntarily terminated his employment with Cummins Engine Company. From 1980 to the present time he has engaged in an auto mechanics course at Indiana Vocational-Technical College where he expects to graduate later this year.

7. The parents have been requested by the Bartholomew County Department of Public Welfare to secure living facilities, specifically a house for the children. A house was rented by the parents in the City of Bloomington for a short period of time, but the parents at the present time do not have the facilities to accept the children back into their home.

8. [Mr. and Mrs. S.] are not motivated to obtain living quarters for the children and only appear to locate a suitable house when faced with a Court hearing.

9. The parents lacked sufficient parenting skills at the time the Welfare Department took custody of the children and the parents have not sufficiently improved these skills and still lack the necessary parenting skills to rear children.

10. [M.S.], over the past six months, while visiting the children did not initiate interaction with the children, nor enter into normal loving and caring responses, and remains passive toward the children.

11. Adequate housing for Mr. and Mrs. [S.] is available in the Columbus, Indiana, area.

12. The parents have visited with the children approximately 25 times since October, 1981, but there has been no i[m]provement in the relationship between the children and the parents.

13. Even if the parents obtain a proper house in which to rear the children in

the near future, the parents have not sufficiently improved their parental skills to meet the necessary medical, emotional and moral needs of the children and there is a reasonable probability that the conditions that resulted in the children's removal will not be remedied.

14. The Bartholomew County Department of Public Welfare has offered assistance, help and services to the parents, but the parents indicate things are fine and they do not see the need for any such assistance so that the offered services haven't been accepted or are ineffective.

15. The Bartholomew County Department of Public Welfare has developed a satisfactory plan for the care and treatment of the children, being continued placement in the foster homes until the children may be placed for adoption.

16. Several of the children have special educational needs and medical needs that have been provided by the Welfare Department with the medical needs costing to date in excess of $6,000.00.

17. The father does not admit any problems have existed with respect to the children with the exception of some deviant sexual conduct on his part occurring at the time the children were placed under wardship. The father assessed the blame for the loss of custody of his children on unjustifiable interference of governmental agencies in spite of the fact that at the time the children were placed under wardship, they were not properly clothed and were not receiving necessary medical care.

18. Mr. [S.] does not perceive the need to take children to a doctor for routine medical care; said perception is partly due to his rearing, since he was not reared in such a manner.

19. The parents do not see their residing in a camper, lack of providing adequate clothing and medical care as an inadequate lifestyle in which to rear their children, even though the children would not thrive emotionally and physically in such an environment.

20. The parents have made no progress in resolving the problems that resulted in the removal of their children from their home, nor are they capable of doing so.

21. The present petition filed by the Bartholomew County Department of Public Welfare is the second petition requesting the termination of the parent-child relationship; the situation involving the parents has not improved, and it is in the best interest of the children that this matter be timely completed and a positive movement made toward placing these children for adoption.

22. Termination of the parent-child relationship is in the best interest of these children.

IT IS THEREFORE, ORDERED, ADJUDGED AND DECREED by the Court that the parent-child relationship existing between [E.S.] and [M.S.], respondents herein and their children, [VMS, AOS, SMS, EAS, and VLS], be and is hereby terminated.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED by the Court that said parental rights are hereby transferred to the Bartholomew County Department of Public Welfare and said Department is granted the authority to place said children for adoption."

Record at 110–113.

ISSUES

1. Is Indiana Code Section 31–6–5–4(2) unconstitutional on its face or did the trial court apply it in an unconstitutional manner by requiring less than clear and convincing evidence in granting DPW's petition?

2. Was there clear and convincing evidence to support the trial court's finding that reasonable services had been offered or provided to the parents to assist them in fulfilling their parental obligations and the parents failed to accept them or they were ineffective?

## DISCUSSION AND DECISION

Mr. and Mrs. S. contend that Indiana Code Section 31–6–5–4(2) is unconstitutional on its face because it requires a standard lower than clear and convincing evidence for a trial court to grant a petition to terminate parental rights. They argue that Indiana Code Section 31–6–5–4(2) requiring "a reasonable probability that the conditions that resulted in his removal will not be remedied" should read "it is clear and convincing that the conditions that resulted in his removal will not be remedied." Appellants' brief at 24–25.

▮ We agree with the parents that procedural due process requires DPW to prove the statutory requisites for termination of parent-child relationships by clear and convincing evidence. *See Santosky v. Kramer,* (1982) 455 U.S. 745, 102 S.Ct. 1388, 1402–03, 71 L.Ed.2d 599; *Ellis v. Knox County Department of Public Welfare,* (1982) Ind.App., 433 N.E.2d 847, 848. However, we do not believe that Indiana Code Section 31–6–5–4(2), when supported by clear and convincing evidence, is constitutionally infirm based upon the reasoning in *Santosky.* As do the Supreme Court dissenters, the parents seem to confuse the procedural due process analysis and requirements of the majority in *Santosky* with substantive due process. *See, e.g., Thompson v. State,* (1981) Ind.App., 425 N.E.2d 167, *trans. denied,* for a discussion of the salient distinctions between the two types of analysis. However, Mr. and Mrs. S. fail to develop the latter argument. In *Santosky* the Court did not deal with substantive due process (*i.e.,* the requirements or allegations which the DPW must prove), but rather it determined only that state proceedings to terminate the parent-child relationship are subject to the Constitutional due process requirements of proof by clear and convincing evidence. The fact that the DPW in Indiana must show by clear and convincing evidence a reasonable probability that conditions resulting in a child's removal from his parents' custody will not be remedied assures a court that there is, in fact, a high degree of probability that the conditions will not be remedied—a standard considerably above the "more likely than not" implications of the preponderance requirement.

We should also remind the parents of our standard of reviewing questions as to the constitutionality of a statute:

"In approaching a consideration of the constitutionality of a statute, we must at all times exercise self restraint. Otherwise, under the guise of limiting the Legislature to its constitutional bounds, we are likely to exceed our own. That we have the last word only renders such restraint the more compelling. We, therefore, remind ourselves that in our role as guardian of the constitution, we are nevertheless a court and not a 'supreme legislature.' We have no right to substitute our convictions as to the desirability or wisdom of legislation for those of our elected representatives. We are under a constitutional mandate to limit the General Assembly to its lawful territory of prohibiting legislation which, although enacted under the claim of a valid exercise of the police power, is unreasonable and oppressive. Nevertheless, we recognize that the Legislature is vested with a wide latitude of discretion in determining public policy. Therefore, every statute stands before us clothed with the presumption of constitutionality, and such presumption continues until clearly overcome by a showing to the contrary."

*Sidle v. Majors,* (1976) 264 Ind. 206, 208–09, 341 N.E.2d 763, 766. Mr. and Mrs. S. have failed to convince us that the legislation at issue [1] is unreasonable, oppressive, or otherwise unconstitutional.

---

1. The entire statute appears in West's Annotated Indiana Code as follows:

"31–6–5–4 Petition for termination of rights; delinquent child or child in need of services

Sec. 4. A petition to terminate the parent-child relationship involving a delinquent child or a child in need of services may be signed and filed with the juvenile court only by the attorney for the county department or the prosecutor; that person shall represent the interests of the state in all subsequent proceedings on the petition. The petition shall be entitled 'In the Matter of the Termination of the Parent-Child Relationship of ⸻, a child, and

■ Likewise, the parents have failed to convince us that the trial court employed a standard of proof lower than clear and convincing evidence to support the allegations required by the statute. The record here, unlike the case of *Ellis v. Knox County Department of Public Welfare,* does not affirmatively attest to the court's use of an improper standard. *Santosky v. Kramer* was decided on March 24, 1982, and *Ellis v. Knox County Department of Public Welfare,* on April 14, 1982. The decision appealed from in this cause was entered June 21, 1982. We do not presume that the trial court erred, *English Coal Company, Inc. v. Durcholz,* (1981) Ind.App., 422 N.E.2d 302, 307, *trans. denied,* but presume instead that the trial court correctly applied the law. *Merchants National Bank & Trust v. H.L.C. Enterprises,* (1982) Ind.App., 441 N.E.2d 509, 511; *Cornett v. Cornett,* (1981) Ind. App., 412 N.E.2d 1232, 1235, *trans. denied.* It is an appellant's burden to show us wherein the trial court erred. *New York Central Railroad Company v. Milhiser,* (1952) 231 Ind. 180, 189, 106 N.E.2d 453, 357, *reh. denied* 108 N.E.2d 57; *Merchants National Bank & Trust Company.*

■ Mr. and Mrs. S. contend that DPW did not show with clear and convincing evidence that there is a reasonable probability the conditions which resulted in the children's removal will not be remedied. The record reflects that the reasons the children initially were made wards of DPW were (1) appalling living conditions, (2) lack of medical attention, and (3) moral degeneracy. After the children had been returned to the parents and the second time the children became wards, the problems were (1) educational neglect, (2) medical neglect, (3) unresolved housing problems, and (4) financial instability. In arguing that the state failed to prove the statutory requisites in this cause with clear and convincing evidence, the parents refer only to the testimony of Terri Brewer, the most recent caseworker assigned to the family. The clearest and most convincing evidence as to whether or not there is a reasonable probability that these conditions would be remedied or would not recur is found not in the testimony of Terri Brewer, but rather in Mr. S's own testimony and actions. For example, on the issue of housing, which had been a problem from the very beginning, the record reflects that the only reason the parents had located suitable housing was that the court and DPW required it before they would return the children. After admitting that he still had not put any money down to reserve adequate housing space at a low income housing unit, but that he had the money available and intended to put it down right after the hearing, Mr. S. testified as follows:

"72. Q. Now, and the only reason you're there is because somebody's telling you that you have to have a house?

A. That' correct.

73. Q. Not because you think you have to have a house?

A. 'Cause to me and that camper just for two people it's convenient and I'm close to work, but this Court that's one of the reasons why I'm in here because the Court says in order to get my children back.

74. Q. If you have a place to keep them?

A. And that's the only way I'm going to do it and that's what I'm working for to do it.

75. Q. You don't really agree with that though do you?

_____, his parent (or parents)' and must allege that:
(1) the child has been removed from his parent for at least six (6) months under a dispositional degree;
(2) there is a reasonable probability that the conditions that resulted in his removal will not be remedied;
(3) reasonable services have been offered or provided to the parent to assist him in fulfilling his parental obligations, and either he has failed to accept them or they have been ineffective;
(4) termination is in the best interests of the child; and
(5) the county department has a satisfactory plan for the care and treatment of the child. *As added by Acts 1978, P.L. 136, SEC. 1.*"

A. Sometimes I don't, but the point is if you got to do it then you do it at all costs. Just like me goint to CETA out there to this automotive schooling."[2]

Record at 222–23. This testimony together with the caseworker's testimony and the parents' inaction over a period of four years provide clear and convincing evidence to support the trial court's findings numbered 5 and 8 and conclusion that there is reasonable probability that the conditions with respect to housing that resulted in the children being removed from the parents will not be remedied.

■ Likewise, on the issue of medical care there was sufficient evidence to support the trial court's finding that those conditions would not be remedied in the future. Terri Brewer testified that she based her conclusion to that effect upon her observations:

"I base that upon the fact that when the children were removed both times all children had no immunizations[;] they had not kept medical appointments both at Riley Hospital and also here in Bartholomew County for the children. They did not give the children medicine that was already prescribed to them[;] they did not cloth[e] the children appropriately[;] when they were sick with colds, the children were barefooted, wearing underwear. They don't appear to realize that children do have medical needs and that the medical needs do need attention."

Record at 170–71. However, Mr. S's own testimony best summed up what the court could expect to happen as far as any change in their parenting techniques in the future:

"103. Q. How about the problem of lack of parenting techniques, do you feel like that's something that the Welfare Department just kind of dragged out of the sky?

A. Alot a times I believe that's true because when I was younger we usually took care of ourself and we was brought up to take care of our own and help each other in the family and the parenting back when I was growing up was made by the parents. Not by the government or anybody else.

104. Q. So you really kind of resent the government's intrusion in your life?

A. Yes, I do.

105. Q. And I'm assuming you're and we've been through this before in these hearing, but I'm assuming that you're feeling that things weren't going that bad?

A. They wasn't in my book they wasn't. I was making good income and my family life was as far as I'm concerned was real happy.

106. Q. And the kids were all right?

A. And they was okay.

107. Q. Healthy enough?

A. They was healthy enough except certain times that they would get sick and stuff like that, but [AOS] for instance became a little seizure is that one I believe it was Memorial Day, close to Memorial Day here the other year and I thought it was wrong when it happened because I took her into the hospital and they made x-rays of her and instead of the hospital sending the x-rays on up to Riley Hospital in Indianapolis, they sent them out to our home by Welfare caseworker. The x-rays for us to take up to Indianapolis. I believe that the hospital should have sent those x-rays straight to Riley Hospital themselves but we took [AOS] over her to Dr. Lowhide for some more x-rays and they believe they found a trace of brain tumor, but soon as we got an opening at Riley Hospital I took her up there and during the operation I was up there with her. Me and my wife too while she's under surgery and my wife stayed up there with for approximately a week after the surgery while I was back here at Cummins working and watching the other three children. But

---

2. Mr. S's reference to his CETA employment and training was developed further at another point in the record. There he testified that he and his wife had a total combined income of about $70.00 per week, but that they were both seeking other employment at Sears and Penneys in Bloomington.

on [SMS] for instance his problems started when he was born about two and one-half months early. The Hyaline Membrane Disease, and his doctor bill for the first month was nine thousand and some dollars for the first month, but there wasn't any medical problems on that because Cummins paid six thousand some dollars of it within a couple weeks. I was under good medical insurance and stuff. So I didn't have any problems I only took the children in to the hospital when they needed it. Just like [EAS] she's sitting there while we was watching t.v. and we had an Electrolux vacuum cleaner sitting on the floor there in the living room or the bedroom and I had the cord plugs in to the back of it but within a seconds time she pulled that cord out of the back end of vacuum cleaner and stuck it in her mouth and if her mouth was dry it wouldn't have affected her at all. But the little saliva and stuff in her mouth shorted a circuit between the terminal on the end of cord and pretty well melted the whole end off of her tongue. Within a splits seconds time. I took her straight in to the emergency room at the Bartholomew County Hospital here and I didn't have to ask questions for anybody to take her there, I took her on my own.

108. Q. That's right, that's right Mr. [S.], you handled those emergency situations but . . . .

A. When they would come up I took care of them immediately.

109. Q. But you didn't handle routine medical care and you didn't take the kids in for check ups or for the shots and you don't feel that that's necessary?

A. I found out from the school that when they become enrolled in school that they would have to have their shots before they go in and that's why I had planned on doing.

110. Q. You were going to give them their shots when the were five or six years old?

A. Seven years old, six or seven.

111. Q. But you don't really feel that those are necessary do you?

A. I'll tell you sir, from all the shots that I've seen children get, it has not helped the colds, it has not helped the disease. They still have the disease and they still die like they've never had the shots.

112. Q. We don't, have you ever heard of Polio?

A. Yes I have, my sister-in-law's had it when she was a child and she's still got the effects of it.

MR. HEIMAN:

Excuse me, can I ask you not to yell?

MR. [S.]:

Yes sir, I'm getting carried away sir, excuse me.

113. Q. So what you're saying, the long and short of what you're saying is that you think alot of modern medical care is not necessary.

A. Yes it is.

114. Q. Yes it is what?

A. It's unnecessary, alot of it is."

Record at 226–30.

76. Q. Just like you taking your kids to the doctor, you don't feel that they need to go to the doctor or all the times that somebody feels, that somebody else might feel that they need to go to the doctor?

A. Sometimes I don't feel it's necessary to go, no.

77. Q. And isn't that one of the problems that we had since the start?

A. Yes that's one of the problems, yes.

78. Q. That the kids weren't going to the doctor?

A. Correct.

79. Q. And you didn't feel as thought they needed to be there, cause that's the way you were raised, huh?

A. That's correct."

Record at 223. Thus, even though the children exhibited a number of medical problems that required treatment, even though there was no financial problem at the time, and even though a close member of the family had suffered from polio as a youth, the parents refused to seek out routine medical care for their children because that was the way they were raised. This same

theme was repeated with respect to Mrs. S's thoroughgoing passivity and failure to interact with the children during visitation, except to namecall or belittle them: Mr. S. interjected the explanation that such teasing was Mrs. S's way of interacting with the children in the past and intimated that such mothering is normal. The fact that neither parent ever inquired of the children's education during visitations or at other times and did not evince any interest in their school work when the children showed it to them strongly supports a conclusion that there had been and would be no change with respect to the parents' basic lack of attention to the children's educational needs. Mr. S's testimony reveals no religious or philosophical convictions opposed to adequate housing, modern education, or medical treatment. In fact, the record shows that he sought out the benefits society had to offer: subsidized housing, medical insurance and emergency aid, schools, and food stamps. What his testimony does reveal is a rejection of social norms with respect to his children's physical and mental well-being and a blind adherence to a standard of neglect and conduct antithetical to society's expectations in these areas. As pointed out by their caseworker, the parents would agree with her suggestions during visits, perhaps only to mollify her, but then fail to follow through upon their contract for change. The parents' acceptance of the social order was purely on their own terms, and their attitude that what was good enough for them was good enough for their children and needed no changing seems the fundamental impediment to any reasonable probability that the deficiencies in parenting, especially respecting medical and educational needs, which existed in the past would be remedied in the future. The evidence to support the court's findings on these issues is clear and convincing.

Mr. and Mrs. S. also argue that DPW did not prove by clear and convincing evidence that it even offered reasonable services to assist them in fulfilling their parental obligations. They contend that, although the caseworker, Terri Brewer, recommended counseling and suggested other modifications of their lifestyle, DPW did no more than inform them of the problem and give directions as to what needed to be done. This, they assert, is inadequate to constitute a reasonable offering of services under the case of *Matter of Jones,* (1982) Ind.App., 436 N.E.2d 849. We disagree.

As this court noted in the case of *In Re Myers,* (1981) Ind.App., 417 N.E.2d 926 at 931, the question of what constitutes reasonable services will depend upon the facts of a given case. Here the facts that DPW did not aid the parents in obtaining food stamps when they were, in fact, ineligible or did not physically locate low income or appropriate housing for them when they were able to and did, in fact, find housing both in Bloomington and Columbus on their own cannot be posited as failure to offer reasonable services. These, clearly, were services which the parents had no need of. Likewise, the fact that DPW did not help them find and stick with counseling in Bloomington after they rejected DPW's offer of a counselor in Columbus does not constitute a failure to offer reasonable services to help them overcome their fundamental lack of parental nurturing skills. They had accepted the counseling services of one counselor who helped them as much as she could. She then referred them to another counselor whose services they rejected without even trying them. They did have two sessions with a counselor they had located on their own in Bloomington, but when several sessions were cancelled, they failed to resume them later. Under the facts of this case, as reflected by the court's findings and Mr. S's testimony, where the parents felt that DPW's efforts to help them represented unjustifiable interference of governmental agencies, it was important that DPW be sensitive to the parents' basic hostility to their notions and help them save face and solve their problems in as independent a manner as possible. From Mr. S's testimony, however, it is clear that the services which DPW had offered to correct the problems resulting in the removal of the children had been rejected in spirit as well

as in truth. This court has said that, where it is argued that DPW has failed to offer or provide services to assist a parent in fulfilling his or her parental obligations, the bottom line is whether or not DPW did all that it could reasonably be expected to do under the circumstances. *In Re Fries,* (1981) Ind. App., 416 N.E.2d 908, 910, *trans. denied.* Here, in the matter of helping the parents develop parental nurturing skills, as in the matters of housing, education, and medical care, DPW did all that it could reasonably be expected to do to aid and assist Mr. and Mrs. S. in correcting the problems which led to the removal of the children. The evidence in the record to support the court's findings to this effect is quite clear and convincing.

Judgment affirmed.

ROBERTSON, P.J., and NEAL, J., concur.