**INDIANA–KENTUCKY ELECTRIC CORPORATION, Appellant (Plaintiff Below),**

v.

**Robert E. GREEN and Green Construction of Indiana, Inc., Appellees (Defendants Below).**

No. 1–1183A364.

Court of Appeals of Indiana, First District.

April 1, 1985.

Rehearing Denied May 8, 1985.

Karl J. Stipher, Lewis D. Beckwith, Baker & Daniels, Indianapolis, Rabb Emison, Robert P. Doolittle, Emison, Emison, Doolittle & Kolb, Vincennes, for appellant.

Curtis V. Kimmell, L. Edward Cummings, Kimmell, Funk & Cummings, Vincennes, Richard McMillan, Jr., Paul W. Reidi, Crowell & Moring, Washington, D.C., for appellees.

ROBERTSON, Judge.

The plaintiff-appellant Indiana-Kentucky Electric Corporation (IKEC) operates an electrical generating facility located in Madison, Indiana. In 1954, the defendant-appellee Green Construction of Indiana, Inc. (GCI), owned by defendant-appellee Robert E. Green (Green), then doing business as Green Coal Company, entered into a long-term Coal Supply Agreement with IKEC. In 1973, Green and GCI ceased selling coal to IKEC which precipitated litigation with IKEC filing suit seeking specific performance with the cause coming to trial in late July and early August, 1975, however, during the trial the parties entered into negotiations and subsequently, a settlement agreement. Among other things, the final version of the written settlement agreement contained Article 2.6 which reads in pertinent part:

It is agreed that each party shall have the right to discontinue deliveries or receipts of coal if, for any reason, it is impossible or not practicable for either party to utilize or deliver the coal, upon the giving of at least twelve (12) month's notice to the other party.

One month after signing the 1975 Coal Settlement Agreement, GCI gave notice of its intent to terminate delivery of coal in twelve months. IKEC again commenced litigation seeking damages for anticipatory repudiation of the 1975 Settlement Agreement. The course of the proceedings was complicated and included action in this court as well as the supreme court and the death of the original trial judge. Suffice it to say that this cause eventually came on for a bench trial on the issues of liability and damages. The essence of the judgment was that Green and GCI were within their rights to cease delivery of coal after giving the twelve month notice and that IKEC was not entitled to damages.

Prior to a discussion of the issues on the merits, our standard of review should be mentioned. On appeal, the burden of showing reversible error is upon the appellant and all reasonable presumptions are indulged in favor of rulings and the judgment of the trial court. The record must reveal the error assigned as basis for reversal. *Raymundo v. Hammond Clinic Ass'n*, (1983) Ind., 449 N.E.2d 276. When a judgment is attacked as being contrary to law, this court neither considers the credibility of the witnesses nor weighs the evidence, instead, we look solely to the evidence most favorable to the judgment, together with all reasonable inferences therefrom, and it is only when this evidence is without conflict and leads to but one conclusion and the trial court reaches a contrary conclusion, will we reverse a decision for being contrary to law. *Litzelswope v. Mitchell*, (1983) Ind.App., 451 N.E.2d 366. In reviewing for sufficiency of the evidence, we will not weigh the evidence or resolve questions of credibility, however, we will look to the evidence which supports the verdict. *Lloyds of London v. Lock*, (1983) Ind.App., 454 N.E.2d 81. In cases tried to the court, the findings and judgment of the trial court will not be set aside unless they are clearly erroneous, *i.e.*, where there are *no* facts or inferences to be drawn therefrom which support the findings. (Our emphasis). *Kimbrell v. City of Lafayette*, (1983) Ind.App., 454 N.E.2d 73.

The Court of Appeals presumes the trial court correctly applied the law. *Matter of VMS*, (1983) Ind.App., 446 N.E.2d 632. We also observe that IKEC is appealing from a negative judgment. In determining whether a negative judgment is contrary to law, the court will neither weigh the evidence nor judge the credibility of the witnesses and we will only consider the evidence favorable to the prevailing party together with all reasonable inferences flowing therefrom. *Young v. Van Zandt*, (1983) Ind.App., 449 N.E.2d 300. An insufficiency of the evidence presents no issue on review of a negative judgment. *Rogers v. Rogers*, (1982) Ind.App., 437 N.E.2d 92. These various standards should be recalled in the subsequent discussion on the merits because it appears to some extent that IKEC's argument would have us

re-evaluate or reject the facts as found by the trial court.

A synopsis of facts favorable to the judgment and relating to the history of the Settlement Agreement, as gleaned from the trial court's findings, shows that on Thursday, July 31, 1975, while the original trial was being held, a meeting occurred between Green and Dunlevy, an officer of IKEC. An agreement was reached which provided, among other things, that Green would deliver to IKEC 2,000,000 tons of coal over a five-year period at a rate of 400,000 tons per year. IKEC would pay Green his mine costs plus 20% profit, up to a maximum of $10.00 per ton for the first million tons and $11.00 per ton for the second million tons. Dunlevy sought and secured company approval of the proposed settlement. IKEC lawyers prepared a draft copy of the agreement which was given to Green's lawyers the next morning, Friday, August 1, 1975. Green was not present at the meeting and did not see the draft copy. Article 2.6 was included in the original draft and read:

> It is agreed that IKEC shall have the right to discontinue deliveries of coal by Seller, if, for any reason, legislative, administrative or judicial action by any governmental authority, including, but not restricted to action to enforce environmental regulations makes it impossible or impracticable for Buyer to utilize the coal.

The purpose of this provision was to protect IKEC in the event governmental restrictions prevented the use of Green's coal, however, Green's lawyers found the provision unacceptable because it was one-sided. IKEC's lawyers redrafted the provision so that either party could terminate in the event governmental restrictions prevented mining or use of the coal. At a meeting on Friday night, Green still rejected Article 2.6. He told Dunlevy that no agreement would be signed unless it was cancellable for any business reason including economic feasibility. Dunlevy replied that such an arrangement could suddenly leave IKEC without a coal supply. Green

suggested a twelve month notice of cancellation. Dunlevy observed that would make it a one-year contract to which Green agreed as to coal delivery, but that the remainder of the agreement relating to Green's obligations on the 1954 contract would be over five years. During the three-hour meeting, Green was adamant regarding termination. At the conclusion of the meeting, Dunlevy believed that in order for the agreement to be acceptable to Green, it would have to permit Green to cancel for any reason. The next morning, Dunlevy called his lawyer (Emison) and instructed him to contact Green's lawyer (Kimmel) and have Kimmel prepare a version of Article 2.6 which Green would find acceptable and sign. That version of Article 2.6, as heretofore quoted, appeared in the final Settlement Agreement. When Dunlevy signed the agreement, he noted that the language relating to governmental restrictions had been deleted, that "not practicable" had been substituted for "impracticable", and that the twelve month cancellation provision had been added. Without further discussion with Green, Dunlevy signed the Settlement Agreement on the same day.

IKEC's first issue states that the trial court erred when it determined that Article 2.6 of the 1975 Settlement Agreement is ambiguous. The trial court's finding reads:

> Article 2.6 of the Settlement Agreement is ambiguous and the intent of the parties in using the ambiguous language cannot be determined from the four corners of the Settlement Agreement. Extrinsic evidence must, therefore, be used to determine the intent of the parties.

In ruling from the bench about ambiguity, the trial judge indicated that there had to be a reason to add the modifying words "for any reason" to the phrase "impossible or not practicable".

The essence of IKEC's argument on this issue is that the phrase "impossible or not practicable" incorporates the impracticabili-

ty standard of U.C.C. § 2–615 [1] (I.C. 26–1–2–615) and that the phrase "for any reason" eliminates the requirements other than impracticability as used in U.C.C. § 2–615.

Green argues that there are at least four reasons why the trial judge was correct. When the ruling is construed with the remainder of the 1975 Settlement Agreement, the background facts and common sense, the term "not practicable" is to be given its ordinary meaning, not the U.C.C. meaning of "impracticable" with the result that Green could terminate delivery, with timely notice, for any business reason including "commercial impracticability". Also, there is no indication that the parties intended Article 2.6 to be more onerous than § 2–615 which is what IKEC's position suggests in that both parties are required to perform for twelve months after it became commercially impracticable. Next, the Settlement Agreement does not define "impossible or not practicable" which is a different term than used in § 2–615. And last, an ambiguity exists between the force majeure provision [2] and Article 2.6 relating to the excusing or termination of coal delivery.

■ The springboard in resolving this issue was summarized by Judge Lybrook in *Bd. of Dir., Ben Davis, Etc. v. Cloverleaf Farms, Inc.,* (1977) 171 Ind.App. 682, 359 N.E.2d 546:

> In construing a contract, several maxims should be kept in mind. First, the instrument should be construed as a whole, and, it should be so construed, if possible, as to render the agreement valid rather than void. Furthermore, the purpose of construing a contract is to ascertain the intention of the parties at the time of the making of the contract. The test for determining whether a contract is ambiguous is whether or not reasonable men would find the contract subject to more than one interpretation. Furthermore, where an agreement is so indefinite upon an essential element that it cannot be construed with reasonable certainty, and where it is not clarified by extrinsic circumstances, there is nothing for the court to construe. This simply means that the court cannot re-write and then enforce contracts, which, to the knowledge of the court, the parties themselves did not enter into. (Citations and footnote omitted).

359 N.E.2d at 549.

*See also: English Coal Co. v. Durcholz,* (1981) Ind.App., 422 N.E.2d 302; *Tucker v. Richey,* (1983) Ind.App., 448 N.E.2d 1206. Stated from a slightly different perspective, a standard for determining ambiguity is whether reasonably intelligent persons on reading the contract would honestly differ as to its meaning. *Huntington Mut. Ins. Co. v. Walker,* (1979) 181 Ind.App. 618, 392 N.E.2d 1182; *O'Meara v. American States Ins. Co.,* (1971) 148 Ind.App. 563, 268 N.E.2d 109.

■ Aside from a retroactive application of the "honestly differ as to its meaning" test, as evidenced by the history of the case, we are of the opinion that the trial judge did not err in finding ambiguity. The terms "for any reason" and "impossible or not practicable" are without explanation or definition in the 1975 Settlement

---

1. In applicable part § 2–615 reads:
   Except so far as a seller may have assumed a greater obligation . . .:
   (a) Delay in delivery or nondelivery in whole or in part by a seller . . . is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the nonoccurrence of which was a basic assumption on which the contract was made . . . .

2. "Force majeure" is defined as any unforseeable causes beyond the control and without fault or negligence of the party affected thereby, such as Acts of God, acts of the public enemy, insurrections, riots, labor disputes, labor or material shortages, fires, explosions, floods, breakdowns of or damage to plants, equipment or facilities, interruptions to transportation, river freeze-ups, embargoes, orders or acts of civil or military authority, or other causes of a similar nature which wholly or partly prevent the mining, delivery and/or loading of coal by the Seller, or the receiving, transportation and/or delivery of the coal by Barge Company, or the accepting, utilizing and/or unloading of the coal by Buyer.

Agreement and, as concluded by the trial court, must have been included for some reason which was not readily apparent. This would satisfy the foregoing stated tests for ambiguity under our standard of review.

IKEC, for its second issue, argues that even if Article 2.6 was ambiguous, the trial court erred in admitting parol evidence to explain a patent ambiguity. Placing reliance upon *Hauck v. Second Nat. Bank of Richmond*, (1972) 153 Ind.App. 245, 286 N.E.2d 852, IKEC observes:

A patent ambiguity is apparent on the face of the instrument and arises by reason of an inconsistency of inherent uncertainty of language used so that the effect is either to convey no definite meaning or a confused meaning. Extrinsic evidence is not admissible to explain or remove a patent ambiguity . . . .

A latent ambiguity arises not upon the face of the instrument by virtue of the words used, but emerges in attempting to apply those words in the manner directed in the instrument. Extrinsic evidence is admissible to explain or clear up a latent ambiguity.

286 N.E.2d at 862 (citations omitted).

The trial judge never made a specific ruling or finding that Article 2.6 contained a patent or latent ambiguity. However, the trial judge did indicate, among other things, that in construing or interpreting the language and intent of Article 2.6, the Uniform Commercial Code could, conceivably have a bearing upon the meaning of the language. The 1975 Settlement Agreement makes no reference to the Uniform Commercial Code. We are of the opinion that under the *Hauck* definition of latent and patent ambiguity this is sufficient to permit the introduction of extrinsic evidence.

IKEC's third issue claims the trial court erred by construing the 1975 Settlement Agreement to permit Green to terminate coal deliveries for any business reason. The argument is divided in two parts. First, IKEC argues that extrinsic evidence was improperly used to change the meaning of the 1975 Settlement Agreement. IKEC also argues that Article 2.6 should have been construed against Green, the party who prepared it.

■ It is IKEC's position that the trial court's allegedly wrongful interpretation of Article 2.6 held that Green could terminate deliveries even if performance caused no hardship so long as a "business reason" existed thereby eliminating the requirement that termination results from "impossible or not practicable" conditions. It is argued that the first two drafts of Article 2.6 concerned termination resulting from governmental restrictions and that in the third draft the scope of permissible reasons for termination was expanded to include "any reason". As a result, IKEC continues, the threshold of difficulty remained substantially the same—"impossible or not practicable"—before either party could cancel under Article 2.6. It is IKEC's position that the trial court changed the meaning of the 1975 Settlement Agreement by narrowing the scope of permissible reasons to terminate to include only business reasons and it eliminated the requirement of a threshold level of difficulty. To a degree, this argument bolsters the trial court's decision that Article 2.6 was ambiguous, however, a review of the evidence favorable to the judgment bears out the trial court's finding. The use of a "business reason" for termination of deliveries does not fall outside of the scope of "any reason" as used in Article 2.6. In the same vein, Green proved that economic or business reasons comport with the threshold of difficulty of "impossible or not practicable". The evidence shows that the trial court did not rewrite the contract.

■ IKEC also argues that it was error for the trial court to not construe the 1975 Settlement Agreement against Green who prepared the document. It is law of long standing that such a rule comes into play only when all other rules fail. *Falley v. Giles*, (1867) 29 Ind. 114. The factual context of this appeal would also put the use of the rule in doubt for the reason that, in effect, IKEC, through Dunlevy, dictated

the terms of the contract by instructing the preparation of a document which Green would sign with IKEC still having the option of accepting or rejecting what was written. A reasonable argument could be made that IKEC was the constructive draftor of the Settlement Agreement. In any event, the facts would indicate that the rule is inapplicable to this case.

■ IKEC argues under the fourth issue that the trial court erroneously applied the "knew or should have known" rule of contract construction. As one example, in its findings, the trial court found in relation to this issue that:

> The inference most logical is that on Saturday morning, Dunlevy reconciled himself to accepting Green's position, so that the case could be settled before trial resumed. At the time Dunlevy signed the Settlement Agreement, he knew that the only proposal acceptable to Green was termination for any business reason on twelve month's notice, and he knew or should have known that this was what Green understood the revised language to mean.

IKEC cites *Western & Southern Life Ins. Co. v. Vale,* (1938) 213 Ind. 601, 12 N.E.2d 350 and *Bd. of Dir., Ben Davis, Etc. v. Cloverleaf Farms, Inc.,* (1977) 171 Ind. App. 682, 359 N.E.2d 546 for the proposition that before the trial court can utilize this rule of construction there must be an ambiguity which is latent. The rule is characterized in *Western v. Vale, supra* as being where there is doubt a contract will be interpreted in the sense that the promisor knew or had reason to know the promisee understood it. Under the facts of this case, we are of the opinion that there was evidence that Dunlevy, hence IKEC, knew that Green wanted a contract for future delivery of coal which could be terminated after twelve month's notice. Because we have heretofore found that the trial court did not err in finding latent ambiguity, and because there is evidence to support the trial court's conclusion, we find no error here.

In the fifth issue IKEC urges that the trial court erred in a number of particulars in its application of the "knew or should have known" rule of contract construction and that there was error in receiving certain testimony in evidence.

IKEC suggests that this court is on an equal footing with the trial court in applying the knew or should have known rule. We perceive this to be true in the abstract, however, it would only be applicable if we find reversible error in the trial court's judgment.

■ Essentially, IKEC's first argument on this issue relies upon the proposition that the reasonable man standard of the knew or should have known rule precludes the trial court from considering statements of Green and GCI not communicated to IKEC. We view this portion of the argument as an invitation to reweigh the evidence. Dunlevy testified he didn't know what Green's position was, however, it is apparent that the trial court did not accept this statement. There was ample evidence from which the trial court could correctly find that Dunlevy knew or should have known of Green's position. Where the evidence is conflicting, we will not reweigh the evidence or judge the witness's credibility. *Litzelswope, supra.*

IKEC then argues that the three changes made in the language of the final version of Article 2.6 (elimination of governmental restrictions, impracticable changed to not practicable and twelve month cancellation) which Dunlevy noted prior to signing would not have caused a reasonable person in IKEC's position to know the meaning which Green and GCI attributed to Article 2.6. It is further argued that these changes did not change the threshold level of performance of impossible or not practicable and, as a result, a reasonable person in IKEC's position would not have known that Green intended for Article 2.6 to allow for termination for any business reason irrespective of the effect on performance. The facts before us on review do not support the position IKEC takes. The changes made in Article 2.6, duly noted by Dunlevy

prior to signing, and viewed from a perspective of previous discussions between Dunlevy and Green clearly support the position taken by the trial court.

IKEC also argues error under this issue in the trial court's finding that: "Since deliveries could be stopped by Green without a twelve month's notice for any force majeure reason, the language in Section 2.6 must have been given the right to cease delivery for other reasons, including business reasons". It is argued that the force majeure provision of the 1975 Settlement Agreement would not have caused a reasonable man (IKEC) to know of Green's meaning of Article 2.6. To a large extent, IKEC's argument on this sub-issue quarrels with the language of the trial court in that the force majeure provision provided for a suspension of deliveries, suspension having a connotation of temporary as opposed to a permanent stoppage provided for in Article 2.6. We cannot read the trial court's finding in the same context as IKEC for it appears to us that that particular finding goes to the ambiguity of Article 2.6 and not towards the application of any reasonable man contract theory. We see no error here.

IKEC asserts that the trial court additionally erred by admitting and relying upon inadmissible and incompetent testimony for the reason that parol evidence about a party's state of mind or subjective intent is not allowed. Primal authority for this position comes from *Warner v. Marshall*, (1905) 166 Ind. 88, 75 N.E. 582. Our reading of *Warner* bears out the trial court's position in that:

> "... the law judges the state of mind or intention of a person by outward expressions only, and excludes all questions concerning intentions unexpressed".

166 Ind. at 119.

Dunlevy's "outward expression", as established by the testimony and his eventual acceptance of the wording of Article 2.6,

would, in our opinion, negate any reliance upon subjective considerations.

■ The final argument of IKEC on this issue is directed to the fact that the trial court decided, on the day of trial, to allow Kimmel, Green's attorney, to testify without withdrawing from the case. IKEC first argues that it was error by the successor trial judge to reverse four pre-trial rulings by the deceased prior judge which prohibited Kimmel from testifying. In support of this argument, IKEC cites *Whisman v. Fawcett*, (1983) Ind.App., 456 N.E.2d 1068 for the proposition that a trial judge may only change a pre-trial order to prevent manifest injustice.[3] *See:* T.R. 16(J). In *Whisman*, it was held that the trial judge erred in amending the pre-trial order during the trial to allow the defendants to raise two defenses not previously included in the pre-trial order. Not all changes of a pre-trial order are automatically considered as reversible error however, and such rulings are reviewable for an abuse of discretion. *Capitol Builders v. Shipley*, (1982) Ind.App., 439 N.E.2d 217. In deciding whether to permit an amendment, the trial court should consider the danger of surprise or prejudice to the opposing party and the goal of doing justice to the merits of the claim. *Capitol, supra.* We conclude that the trial court did not abuse its discretion in ruling that Kimmel could testify without withdrawing from the case, and that manifest injustice did not result from the ruling, the primary reason being that Kimmel's testimony as it related to Emison's telephone call and attendant instructions should not have surprised IKEC. It was a matter known to both parties even in the absence of discovery. We will not substitute our judgment for that of the trial court.

■ Also, under this sub-issue, IKEC argues that it was error to allow Kimmel to testify without withdrawing from the case in violation of Disciplinary Rule 5–102(A). Kimmel advised the trial court of his

---

**3.** Manifest: synonymous with open, clear, visible, unmistakable, indubitable, evident, and self-evident. Black's Law Dictionary (4th Ed) at 1195. An injustice that is obvious, directly observable, and not obscure. *State v. Hysted*, (1983) 36 Wash.App. 42, 671 P.2d 793.

lengthy association with this case throughout its long history. D.R. 5–101(B)(4) permits such testimony if refusal would work a substantial hardship on the client because of the distinctive value of the lawyer as counsel in the case. It was on this premise that Kimmel was permitted to testify. Just as in *Shelby Federal Sav. and Loan Ass'n. v. Doss,* (1982) Ind.App., 431 N.E.2d 493, we refuse to substitute our judgment for that of the trial court. Additionally, and in retrospect, the testimony of the opposing attorneys, Kimmel and Emison, dovetailed in all respects. When viewed in this context, the testimony may well have been an uncontested matter if uncontested is defined as being without conflicting evidence to the contrary. If that be the case, then Kimmel's testimony would have been sanctioned by D.R. 5–101(B)(1) also.

In the next issue, IKEC assigns error on the part of the trial court that Green failed to give notice of termination and that Green was obligated on the 1975 Settlement Agreement. We perceive this argument to be based upon the fact that Green did not personally notify IKEC of the intent to stop coal deliveries. The facts show that Kimmel, Green's lawyer, wrote a letter to IKEC on behalf of GCI notifying them of an end to coal delivery twelve months hence. Dunlevy, upon receipt of the letter, called Robert Green who ran the GCI mining operations.

▪ Assuming the issue was properly raised at trial, a fact which Green disputes, we fail to see the harm. There is no hint of a doubt that actual notice of termination was given and received. Under our standard of review, any error in this regard cannot be considered as reversible.

Moreover, in light of the ultimate result of the trial that IKEC was not entitled to damages, any failure of the trial court to distinguish between Green as an individual and GCI is harmless error.

▪ IKEC's final issue alleges error on the part of the trial court in failing to award damages for GCI's nondeliveries of coal following its notice of termination.

The trial court concluded that as a matter of law that IKEC neither pleaded nor proved damages for deficiencies in coal deliveries between September 1, 1975, and October 1, 1976. IKEC's argument that the issue was tried by consent and that there was evidence presented on the issue of damages requires a determination in favor of Green for the reason that IKEC is appealing from a negative judgment and under those circumstances, sufficiency of the evidence presents no issue on review. *Steup v. Indiana Housing Finance Authority,* (1980) 273 Ind. 72, 402 N.E.2d 1215.

Judgment affirmed.

RATLIFF, P.J., and NEAL, J., concur.