**DAIRYLAND POWER COOPERATIVE,
a Wisconsin cooperative
association, Plaintiff,**

**v.**

**AMAX INC., a New York
Corporation, Defendant.**

No. 84–C–998–C.

United States District Court,
W.D. Wisconsin.

May 9, 1986.

980

Thomas J. Zaremba & Niles Berman, Wheeler, Van Sickle, Anderson & Harvey, Madison, Wis., Eugene T. Holmes, Atlanta, Ga., for plaintiff.

John Skilton, Foley & Lardner, Madison, Wis., for defendant.

## ORDER

CRABB, Chief Judge.

This is a civil action for monetary, declaratory and injunctive relief based on a contract under which defendant agreed to sup-

ply plaintiff with certain amounts of coal over a twenty-year period. Plaintiff seeks monetary damages for breach of contract, a declaration of the parties' rights under the contract, rescission or reformation of the contract on the ground that its terms are unconscionable under Section 2–302 of the Uniform Commercial Code, treble damages for defendant's alleged violations of Section 2(a) of the Clayton Act, as amended by the Robinson–Patman Act, 15 U.S.C. § 13(a), and an injunction against future such violations. Jurisdiction is present under 28 U.S.C. § 1332 and 15 U.S.C. § 26.

Now before the court is plaintiff's motion for summary judgment on its claim that defendant breached the coal supply agreement by refusing to renegotiate the contract price or to adjust the price upon plaintiff's showing of economic hardship (Count Two). Also before the court is defendant's motion for partial summary judgment dismissing plaintiff's unconscionability and Robinson–Patman Act claims (Counts Four and Five); the former on the ground that it is barred by the statute of limitations and the doctrine of laches, the latter on the grounds that no price discrimination occurred and that the claim is barred by the statute of limitations.

### FACTS

From the proposed findings of fact and affidavits submitted by the parties, I conclude that there is no genuine dispute concerning the following material facts.[1]

Plaintiff Dairyland Power Cooperative (Dairyland) is a cooperative association organized under Wisconsin law with its principal offices in La Crosse, Wisconsin, engaged in the business of generating, transmitting and selling electric energy. Plaintiff supplies electricity to 29 rural electric distribution cooperatives located in Wisconsin, northeastern Iowa and southeastern Minnesota. Defendant Amax, Inc., is a

corporation organized under New York law with its principal offices in Greenwich, Connecticut. Among other activities, defendant is engaged in the mining and sale of coal through its Amax Coal Company Division, whose principal offices are located in Indianapolis, Indiana. Defendant supplies coal to plaintiff and to a number of other utilities plaintiff considers to be its competitors.

*The coal supply agreement between Amax and Dairyland*

In the early 1970's, plaintiff decided to build a 350 megawatt coal burning generating station in Alma, Wisconsin. At that time, plaintiff operated three other coal generating stations with a combined output capacity in excess of 600 megawatts. Plaintiff acquired coal for its existing generating stations from a number of coal suppliers, including defendant. Many of plaintiff's coal supply contracts were arranged on a commission basis by a coal broker, United Coal Sales, Inc. (United).

On October 4, 1974, defendant submitted to United a written proposal offering to supply coal to the new Alma generating station from its Belle Ayr/Eagle Butte, Wyoming mines. Defendant proposed a ten-year contract for one million tons of coal each year at a price of $5.00 per ton subject to future price escalations, and supplied United with a draft contract containing the terms of its proposal. On November 4, 1974, United sent copies of defendant's offer and the proposed contract to plaintiff.

At some point, plaintiff's attorney, Floyd Wheeler, reviewed the contract and objected to some of its provisions. During the course of contract negotiations, plaintiff succeeded in changing certain terms of the agreement, including the term of the contract and the procedure for calculating price adjustments.

---

1. Defendant's response to plaintiff's proposed findings of fact incorporates by reference an affidavit prepared by Frederick C. Dunbar, a consulting economist. Defendant proposes that the statements in that affidavit be included as additional findings of fact. Dunbar's affidavit is based on coal industry research rather than personal knowledge, and consists of opinions and arguments about the validity of plaintiff's contract claims. This submission will be disregarded because does not comply with the requirements of Rule 56(e), Federal Rules of Civil procedure or this court's procedures for summary judgment motions.

On July 30, 1975, plaintiff and defendant entered into a written coal supply agreement for a term running from October 1, 1974 to December 31, 1977. Under the terms of the contract, which have never been modified, defendant agreed to sell and plaintiff agreed to buy 1,000,000 tons of coal during each full calendar year of the contract's term. The contract gave plaintiff the option to purchase as much as 1,050,000 tons of coal or as little as 950,000 tons. The original base price of the coal to be purchased under the contract was $5.00 per ton, free on board in rail cars at the Belle Ayr Mine in Campbell County, Wyoming.

Defendant was responsible for the delivery of the coal. Under the provisions of the contract, shipments were to begin during the fourth calendar quarter of 1978. Because of delays in the construction of the plant for which the coal was purchased, shipments did not begin until October, 1979. Between 1979 and 1984, defendant shipped to plaintiff following tonnages of coal:

| 1979 | 206,674 |
| 1980 | 759,756 |
| 1981 | 942,848 |
| 1982 | 760,057 |
| 1983 | 881,898 |
| 1984 | 950,000 |

The contract provides two separate mechanisms for making adjustments to the initial base price of coal under the contract. The first of these is included in Section 7 of the contract. The second is set forward in Sections 8 and 14.

Section 7 of the contract provides a mechanism under which defendant can adjust the base price of the coal in accordance with the level of inflation and the cost of producing coal. Section 7 describes a number of cost factors that are subject to adjustment and provides mathematical formulas for the readjustment of each factor.

By letter dated October 4, 1978, Daniel Kealing, defendant's contract administration manager, submitted for plaintiff's review and approval a summary of all price adjustments that had accrued under Section 7 of the contract from its effective date of October 1, 1974 through July 1, 1978. Included in the materials defendant sent to plaintiff were details pertaining to base period costs factors, explanations of the price adjustment methodology and a schedule showing the amount of each adjustment and the date it was implemented. Kealing stated that the price adjustments proposed at that time were designed to supersede and replace all prior adjustments.[2]

In a letter dated January 4, 1979, Douglas Peterson, Director of Fuel Management for Dairyland, stated that he found defendant's proposed adjustments "for the most part to be in conformance with the terms of the Coal Supply Agreement." Peterson questioned a few of the proposed price adjustments, suggested alternative methods of calculating other adjustments, and requested further documentation.

Kealing responded to Peterson's comments in a letter dated March 5, 1979. Kealing provided the additional information Peterson had requested, corrected a mathematical error Peterson had pointed out, and recalculated several price adjustments using the methodology Peterson had suggested. In addition, Kealing updated the price adjustments to include adjustments calculated through January 6, 1979. Defendant's proposed adjustments brought the price of coal sold to plaintiff to $7.723 per ton excluding quality adjustments and black lung excise tax.

By letter of March 22, 1979, Peterson informed Kealing that Dairyland had reviewed the March 5 escalations and "found the adjustments to be in order." On April 3, 1979, James W. Taylor, Dairyland's Assistant General Manager, signed a form indicating Dairyland's acceptance and approval of the price increase.

From January 1, 1979 to January 1, 1985, defendant proposed numerous adjustment proposals pursuant to Section 7 of the con-

2. Although defendant's proposed findings of fact are somewhat unclear on this point, it appears that defendant had submitted price adjustments for plaintiff's review on prior occasions, and that plaintiff had approved the adjustments.

tract. In each instance, plaintiff approved the adjusted prices and paid them. After shipments of coal began in October 1979, plaintiff objected on several occasions to the magnitude of the contract price compared to the market price and to defendant's overrecovery of actual cost changes. Plaintiff signed defendant's price adjustments with the express understanding that plaintiff's signature did not constitute a waiver of such objections.

The base price of the coal was also subject to revision under the price renegotiation procedures of Sections 8 and 14 of the contract. Section 14 of the contract contains the following provisions:

> Section 14. *Relief From Economic Hardship*
>
> (a) *Notification Regarding Economic Hardship.* Seller and Buyer acknowledge the possibility of either party sustaining an actual economic hardship under this Agreement from conditions which were unforeseeable as of the effective date hereof. At any time either party believes it has sustained an actual unforseeable economic hardship under this Agreement and wishes to invoke the provisions of this Section 14 to obtain relief, it shall give notice in writing to the other party setting forth specifically the following:
>
> (i) the existence, nature, cause, extent and impact of such economic hardship;
>
> (ii) the facts establishing that the conditions causing such actual economic hardship were unforeseeable. The party giving such notice shall also state the relief (subject to the provisions of Sub-section (b) below) which it considers reasonable and appropriate to eliminate such economic hardship.
>
> (b) *Causes and Conditions Not Appropriate for Relief Under Section 14.* Economic hardship arising from any of the following types of causes or conditions shall not be grounds for relief hereunder:
>
> (i) where the cause or condition arises from a matter involving the internal operations of any division of Amax, Inc., other than the Amax Coal Compa-

ny, or any division or subsidiary of Dairyland Power Cooperative, other than Buyer hereunder;

> (ii) where the cause or condition arises from changes in the market for coal resulting from competitive factors;
>
> (iii) where the cause or condition arises from availability or costs of alternative fuels; or
>
> (iv) where the cause or condition arises from the prohibition to take deliveries of, or to utilize the coal supplied hereunder, the effect of which is provided for in Section 15.
>
> (c) *Procedure for Obtaining Relief from Economic Hardship.*
>
> (i) If an economic hardship is claimed by Seller under Sub-Section (a), then Seller shall have the right to request renegotiation in accordance with Section 8, and further provided, that if Seller does request such renegotiation then both Seller and Buyer shall have their respective rights and obligations as set forth in Section 8.
>
> (ii) If an economic hardship is claimed by Buyer under Sub-Section (a), then Buyer shall have the right, upon sixty (60) days' written notice to Seller, to request Seller to invoke the provisions of Section 8.
>
> (d) *Automatic Economic Hardship.* Notwithstanding anything to the contrary provided for in this Coal Supply Agreement, if the value of the Consumer Price Index, as published monthly by the U.S. Department of Labor, should increase thirty percent (30%) or decrease thirty percent (30%) from the value of such index for October, 1974, a situation of economic hardship shall automatically be deemed to exist and section 14(c)(i) or Section 14(c)(ii), as appropriate, shall apply.
>
> Any change in the value of the Consumer Price Index subsequent to notice by Seller or Buyer pursuant to this Sub-Section (d) shall not nullify the existence of an economic hardship.

Section 8 of the contract contains the following provisions:

> Section 8. *Renegotiation.*

(a) Notwithstanding anything to the contrary provided for in this Coal Supply Agreement, it is agreed that during the term of this Coal Supply Agreement the Seller, from time to time, shall have the right to request a renegotiation of the Adjusted Base Price, the first such request not to be made before five (5) years subsequent to the date of a "previous" request for renegotiation; provided, however, that any request for a renegotiation made pursuant to Section 14 may be made at any time and such a request for renegotiation is not limited in any way by the above specified time periods, and further; provided, that a request for renegotiation made pursuant to section 14 shall not be considered a "previous" negotiation.

Any request for renegotiation shall be in writing and shall state the revision to the Adjusted Base Price which Seller believes to be appropriate.

(b) If and when any such request for renegotiation is made by Seller, Buyer shall have a period of sixty (60) days from the date of such request for renegotiation within which to notify Seller in writing of its election to:

(i) renegotiate the Adjusted Base Price, or

(ii) decline to renegotiate the Adjusted Base Price.

Failure of Buyer to give Seller the aforesaid written notice of its election within the sixty (60) day period shall be deemed as the election by Buyer to decline to renegotiate the Adjusted Base Price.

(c) If Buyer elects to renegotiate the Adjusted Base Price and an appropriate amendment to this Agreement resulting from such renegotiation has not been fully executed within one hundred eighty (180) days following the date of Seller's request for renegotiation, or if Buyer declines to renegotiate, Seller shall have the option to:

(i) terminate this Agreement, effective not less than one hundred twenty (120) days, nor more than one hundred eighty (180) days following written notice to Buyer, but subject to Buyer's right to postpone such termination, as set forth below; or

(ii) continue to supply coal in accordance with the terms of this Agreement, provided, however, that if the request for renegotiation resulted from Buyer's proper request to Seller under Sub–Section 14(c), and Seller has elected the option specified in this Sub–Section (c)(ii), then Seller shall, in accordance with the principles of good faith, determine whether or not Buyer has incurred an economic hardship; and, if Seller determines that no economic hardship exists, then it shall continue to supply coal in accordance with the terms of the Agreement. If Seller determines that an economic hardship exists, then Seller shall continue to supply coal in accordance with the terms of the Agreement but shall adjust the Base Price as it deems appropriate to give relief to the Buyer.

The language of sections 8 and 14 of the contract is identical to the language in the draft contract prepared by Amax.

By March 13, 1981, the value of the Consumer Price Index, as published monthly by the U.S. Department of Labor, had increased by more than 72% from the value of the index in October, 1974.

On March 13, 1981, plaintiff claimed automatic hardship under subsection 14(d) of the contract.[3] Pursuant to section 14(c)(ii), plaintiff requested defendant in writing to request a renegotiation of the adjusted base price according to the terms of section 8. In a letter dated April 29, 1981, defendant requested renegotiation of the adjusted base price, and advised plaintiff that section 8(b) of the contract gave plaintiff sixty days in which to inform defendant of its decision to renegotiate or to decline to renegotiate. In that letter, defendant declined

---

**3.** Presumably this was the first time plaintiff had made a hardship claim under Section 14(d) of the contract.

to state what revision of the adjusted base price it considered appropriate until plaintiff provided supporting documentation.[4]

On June 5, 1981, plaintiff notified defendant that plaintiff had elected to renegotiate the adjusted base price. Plaintiff and defendant held a meeting on July 27, 1981. By that date, the price of coal under the contract had risen to $10.09 per ton. The parties had different perceptions of the purpose of this meeting. Plaintiff viewed the meeting as the first in a series of discussions aimed at renegotiating the contract ¦price of the coal. Defendant construed the contract as requiring plaintiff to show actual economic hardship before defendant was obligated to consider price relief, and viewed the meeting as a plaintiff's opportunity to provide evidence that it had suffered actual economic hardship. At the time of the meeting, defendant did not inform plaintiff that it considered a showing of actual economic hardship to be a prerequisite to the commencement of price negotiations.

At the close of the July 27 meeting, defendant stated that it would not adjust the contract price in response to plaintiff's March 13, 1981 request. A Dairyland employee proposed deferring delivery of some of the committed tonnage until later in the contract period. Defendant later proposed such a deferral and plaintiff rejected it.

On June 11, 1981, in response to defendant's April 29, 1981 letter requesting supporting documentation, plaintiff submitted a number of complaints about past price adjustments that had increased the cost of coal. Thomas Mellem, an employee of defendant, reviewed these objections and concluded that the price adjustments had been fully justified under the contract. In addition to reviewing plaintiff's documentation, Mellem conducted an evaluation of the effects of inflation upon plaintiff and defendant. He concluded that the price charged to plaintiff had not greatly exceeded the general rate of inflation, and that inflation had caused defendant's profit margin to shrink in real dollar terms.[5]

In a letter dated August 10, 1981, defendant informed plaintiff of the basis for its refusal to adjust the contract price: "This letter will confirm that, as indicated at the conclusion of [the July 27] meeting, AMAX has determined in good faith that an economic hardship does not exist under such Coal Supply Agreement."

At the time defendant refused to adjust the contract price in response to plaintiff's March 13, 1981 request, the parties had not executed an amendment to the contract and had not agreed to a new contract price.

At all times subsequent to plaintiff's March 13, 1981 renegotiation request, defendant has elected to supply coal under the contract, but has made no adjustments in the contract price other than those outlined in Section 7 of the contract.

*Defendant's contracts with other utilities*

Defendant has sold coal from the Belle Ayr/Eagle Butte mines to a number of other utilities. Plaintiff considers itself to be in competition with three of these utilities: Interstate Power Company, Iowa Power and Light Company, and Wisconsin Power and Light Company.

On October 1, 1974, defendant entered into a coal supply agreement with Wisconsin Power & Light Company at an initial base price of $5.00 per ton, the same initial base price as defendant offered plaintiff in an agreement with the same effective date. Effective July 1, 1978, defendant and Wis-

---

**4.** In its proposed findings of fact, defendant asserts that the purpose of this request for supporting documentation was to enable defendant to evaluate plaintiff's economic hardship claim. Plaintiff disputes this assertion and the underlying inference that the contract required plaintiff to show actual economic hardship before price renegotiation was required. I decline to find as fact that defendant sought documentation in order to evaluate plaintiff's economic hardship claim. Defendant's April 29, 1981 letter makes no mention of economic hardship. It simply states "until AMAX has received appropriate supporting documentation from you, it is not in a position to suggest the amount of the revision [to the adjusted base price]."

**5.** Plaintiff disputes the assumptions on which this evaluation was based, the accuracy of its conclusion that the contract price had not greatly exceeded the general rate of inflation, and the analysis on which that conclusion is based.

consin Power & Light amended their original contract, extending its expiration date from February 28, 1980 to February 28, 1981, and reducing the contract price to $7.00 per ton. Before this amendment took effect, the operative price under the Wisconsin Power & Light Contract had been $7.741 per ton.

Defendant and Wisconsin Power & Light later executed another amendment to the original contract. Effective October 1, 1979, this amendment extended the term of the contract through February 28, 1982 and fixed Wisconsin Power & Light's price at $7.75 per ton. On October 1, 1979, plaintiff was paying a price of $8.718 per ton.

In October 1981, defendant and Wisconsin Power & Light entered into negotiations for another contract amendment. These negotiations resulted in an extension of the contract term through February 28, 1983. The new amendments became effective November 1, 1981. Prior to March 1, 1982 Wisconsin Power & Light was paying $10.038 per ton of coal. As of March 1, 1982, Wisconsin Power & Light's price was $7.76 per ton, compared to plaintiff's April 1, 1982 price of $11.64 per ton.

In subsequent amendments to the original contract, effective October 1, 1982, defendant and Wisconsin Power & Light agreed to extend the contract price through December 31, 1984. These amendments resulted in price reductions to $7.00 per ton, effective March 1, 1984, to $5.40 per ton, effective January 1, 1984, and to $5.15 per ton, effective February 1, 1984. From July 1981 through December 31, 1984, defendant continued to sell coal to plaintiff at prices ranging from $10.09 to $11.628 per ton.

Defendant's contract with Iowa Power & Light Company was effective August 31, 1973 and extends through December 31, 1997. The initial base price of coal under the contract was $2.10 per ton. In December 1981, Iowa Power & Light Company was purchasing coal from defendant's Belle Ayr mine at $7.394 per ton. Under the terms of that contract, Iowa Power & Light was entitled to purchase up to 105% of the annual base tonnage of 2,400,000 tons then in effect.

On December 2, 1981, Bill Merrill, a representative of Iowa Power & Light, proposed to defendant that the contract be amended to allow Iowa Power & Light to purchase up to 115% of the annual base tonnage. Defendant accepted this proposal in a contract amendment that also extended the expiration date of the contract from December 31, 1997 to December 31, 1999.

Since July 1981, defendant has sold coal to Interstate Power Company for prices ranging from $7.27 to $8.471 per ton.

## DISPUTED MATERIAL FACTS

Prior to the July 27, 1981 meeting between plaintiff and defendant defendant had not made a final determination whether plaintiff had suffered actual economic hardship. Plaintiff never made a showing of actual economic hardship and never incurred such a hardship.

## OPINION

### Count Two: Breach of contract

In the second claim of its second amended complaint, plaintiff seeks to recover from defendant an estimated $23,900,000 in overcharges caused by defendant's bad faith refusal to adjust the price of coal upon plaintiff's claim of economic hardship. Plaintiff seeks summary judgment on its claim that defendant breached the coal supply agreement by refusing to renegotiate the contract price of coal once the Consumer Price Index has increased by 30% from its October, 1974 value; and by refusing to adjust the contract price in good faith after plaintiff requested that the contract price be negotiated, defendant offered to renegotiate the price, the parties failed to failed to reach an agreement about a new price, and defendant elected to continue supplying coal under the contract. Plaintiff also seeks a declaration that the contract does not preclude market price from being the basis for determining the reasonable price to which defendant should have adjusted the contract price as of July 27, 1981.

*Plaintiff's right to renegotiate the contract price*

■ Plaintiff contends that sub-sections 14(d) and 14(c)(ii) of the contract give the buyer the right to enter into renegotiations of the contract price once the Consumer Price Index has increased by 30% from its October 1974 value, and that defendant breached the contract by refusing to enter into renegotiations.

Plaintiff requested defendant to invoke the renegotiation provisions of Section 8 on March 13, 1981. Defendant requested a renegotiation of the adjusted base price on April 29, 1981. Plaintiff elected to renegotiate on June 5, 1981. Both parties agree that no price negotiations occurred at their meeting on July 27, 1981. The question raised by plaintiff's motion is whether defendant committed itself to enter into discussions aimed at reaching a new contract price when it requested price renegotiation on April 29. Plaintiff argues that once defendant requested renegotiation, it was under a contractual duty to conduct meaningful discussions with plaintiff about a new price, and that defendant's refusal to take part in negotiations constitutes a breach separate from defendant's refusal to set a new contract price.

Section 8(c) of the contract may be read as providing that once the seller has agreed to request buyer to renegotiate, a period of negotiation will in fact follow:

> If Buyer elects to renegotiate the Adjusted Base Price and an appropriate amendment to this Agreement resulting from such renegotiation has not been fully executed within one hundred eighty (180) days following the date of Seller's request for renegotiation, Seller shall have the option to:
> (i) terminate this agreement, ... or
> (ii) continue to supply coal....

While not explicitly phrased as a mandatory requirement requirement to renegotiate, this section seems to commit buyer and seller to make a substantial effort to reach agreement on an appropriate amendment

within a certain period of time. Sub-sections 8(c)(i) and (ii) may be seen as provisions of last resort that are triggered only after renegotiation process has failed to produce a final result within the 180–day time frame. Sub-section 8(c)(ii) directs the seller to consider economic hardship upon the buyer if the seller chooses to continue supplying coal after attempts to renegotiate have failed. Nothing in the explicit language of the contract states that considerations of actual economic hardship may not enter into discussions between buyer and seller during the 180 day renegotiation period.[6] However, the contract does not authorize the seller to refuse to take part in negotiations because it is not satisfied that the buyer has suffered actual economic hardship.

I conclude that the contract imposes upon the seller an affirmative duty to enter into negotiations after the seller requests renegotiation and the buyer agrees to renegotiate. While I further conclude that defendant breached this duty by refusing to renegotiate, it appears that the measure of damages for this initial breach is highly speculative. The contract provides for the possibility that the parties may not reach an agreement on a new contract price, whether because of a party's breach or the failure of good faith negotiations. The more substantial issue raised by plaintiff's motion is whether defendant was under a contractual duty to adjust the contract price after renegotiation attempts failed and defendant elected to continue supplying coal.

*Defendant's duty to adjust the contract price*

■ Under the language of 8(c)(ii) of the contract, once the parties have failed to reach an agreement on a new contract price and the seller has decided to continue supplying coal

> then Seller shall, in good faith, determine whether or not Buyer has incurred an economic hardship; and if Seller determines that no economic hardship exists,

---

**6.** I address below plaintiff's contention that defendant's inquiry into economic hardship was not proper under any circumstances once a situation of automatic economic hardship was established under Section 14(d) of the contract.

then it shall continue to supply coal in accordance with the terms of the contract. If Seller determines that an economic hardship exists, then Seller shall continue to supply coal in accordance with the terms of the contract but shall adjust the Base Price as it deems appropriate to give relief to the buyer.

Section 14(d) provides that "[n]otwithstanding anything to the contrary provided for in this Coal Supply Agreement ... a situation of economic hardship shall automatically be deemed to exist" when the Consumer Price Index increases 30% from its October, 1974 level, in which event "Section 14(c)(i) or 14(c)(ii), as appropriate, shall apply." The parties dispute whether a showing of automatic economic hardship under Section 14(d) obligates the seller to provide the price relief required by Section 8(c)(ii) without finding actual hardship.

Plaintiff argues that once the increase in the Consumer Price Index gave rise to a situation of automatic economic hardship on March 13, 1981, defendant was obligated to provide price relief by adjusting the base price without any further inquiry into whether plaintiff was experiencing actual hardship. Plaintiff contends that this interpretation is borne out by the clear language of the contract, and that any ambiguities should be resolved against the drafter of the contract without reference to extrinsic evidence.

Defendant contends that the automatic economic hardship provision of Section 14(d) is simply a "trigger" provision to encourage the parties to reassess their bargains under the contract in light of inflation. In defendant's view, the seller is not required to consider price relief unless it determines in good faith that the buyer has suffered actual economic hardship. Defendant contends that the contract is "not wholly unambiguous," and urges the court to examine extrinsic evidence as it bears upon the parties' interpretations of the contract.

Section 18(i) of the contract provides that Indiana law shall control the construction of the contract, and the parties agree that Indiana law is controlling in this respect.

Under Indiana law, extrinsic evidence may not be admitted to construe a contract unless it has been determined that the contract is ambiguous. *Herz Straw Company v. Capitol Paper Company*, 216 Ind. 568, 24 N.E.2d 921 (1940); *Indiana–Kentucky Electric Corporation v. Green*, Ind.App., 476 N.E.2d 141, 145 (1985). The standard for determining "whether a contract is ambiguous is whether or not reasonable men would find the contract subject to more than one interpretation" or "whether reasonable persons on reading the contract would honestly differ as to its meaning." *Indiana Kentucky Electric Corporation*, 476 N.E. 141 at 145.

Plaintiff maintains that defendant's interpretation is inconsistent with the plain language of the contract, and that no reasonably intelligent person would choose such an interpretation. To support its argument, plaintiff recites the well established principle that a court construing a contract must give reasonable meaning to each provision and avoid interpretations that render portions of the contract meaningless. *University Casework Systems, Inc. v. Bahre*, 172 Ind.App. 624, 362 N.E.2d 155, 160 (1977). Plaintiff contends that to interpret the automatic hardship provision of Section 14(d) as a mere trigger for renegotiation is to render that section meaningless. In plaintiff's view, because Section 14(a) already provides a mechanism by which the parties may obtain price relief upon a showing of actual hardship, the automatic hardship provision of Section 14(d) would serve no meaningful purpose if it did not require the seller to adjust the contract price without a showing of actual hardship. According to plaintiff, if the seller is given the opportunity to determine that no actual hardship exists after the buyer claims hardship under Section 14(d), then the automatic hardship provision provides the buyer nothing more than the meaningless ritual of a letter from the seller requesting renegotiation.

I am unpersuaded by the argument that defendant's interpretation reads Section 14(d) out of the contract. An interpretation that allows the seller to evaluate the

buyer's actual economic condition after a 30% rise in the Consumer Price Index does not render section 14(d) a mere duplicate of Section 14(a). Under this reading of the contract, 14(d) still serves a purpose: it gives the *seller* the right to pursue price adjustment without showing actual hardship. This reading is certainly more advantageous to the seller, but it does not render Section 14(d) meaningless.[7] Even though the protections afforded to seller and buyer may be something less than symmetrical under this construction, it is not a foregone conclusion that the buyer receives only an empty ritual. Section 8(c)(ii) of the contract requires the seller to exercise good faith in determining whether plaintiff is experiencing actual economic hardship. This requirement limits the discretion of the seller in making such a determination, and allows the buyer to challenge an arbitrary decision by the seller to continue supplying coal at the contract price.

Under the standard advanced in *Green*, 476 N.E.2d 141, I find that the contract is ambiguous. Neither party's construction of the contract is unreasonable. Section 14(d) of the contract does not state whether a finding of automatic economic hardship may be the basis for price adjustment under Section 8(c)(ii); only that the buyer may request renegotiation of the price through sections 14(c)(ii) and 8. It is unclear whether the words "notwithstanding anything to the contrary" in Section 14(d) are meant to qualify an automatic hardship finding as the kind of hardship required by Section 8(c)(ii). Nothing in the language of Section 8(c)(ii) indicates whether 14(d) hardship can be the basis for price relief. Section 8(c)(ii) does not specifically direct the seller to determine whether *actual* economic hardship exists. However, the words "determine" and "in good faith" suggest that the seller is not to make a mechanical finding, but rather to undertake an independent

inquiry into the buyer's economic condition. It would not be unreasonable to find that the drafters of the contract intended to subject the buyer's hardship claim to an additional level of review after price renegotiation has failed before requiring the seller to provide price relief.

Having concluded that there are two reasonable interpretations of the contract, it remains to consider plaintiff's argument that whatever ambiguities exist should be resolved against the drafter of the contract without reference to extrinsic evidence. Under certain circumstances, when there are two reasonable interpretations of a contract term that was written by one of the parties and merely assented to by the other, the court may adopt the meaning that is less favorable to the drafter of the contract. 3 *Corbin on Contracts* § 559 at 262–63 (1960). However, the rule of interpretation against the drafter of the contract is to be applied as a last resort; only if

> after applying all of the ordinary processes of interpretation, including all existing usages, general, local, technical, trade, and the custom and agreement of the two parties with each other, having admitted into evidence and duly weighed all the relevant circumstances and communications between the parties, there ... [is] doubt as to the meaning that should be given and made effective by the court.

*Id.* at 262.

With the exception of one reference to statements made during contract negotiations between the parties that is not properly before the court, plaintiff's motion for summary judgment is based solely on its reading of the express terms of the contract.[8] Defendant submits extrinsic evidence that purports to show a course of dealings bearing upon the parties' practical constructions of the contract. Defendant

---

7. In its reply brief, plaintiff alludes to contract negotiations during which Amax represented Section 14(d) as a provision intended to provide equal protection for both parties in the form of parallel remedies. Plaintiff cites deposition testimony that was not included in plaintiff's proposed findings of fact and to which defendant

has not had an opportunity to respond. As the substance of plaintiff's assertion was not made the subject of formal factfinding, it will not be considered on this motion for summary judgment.

8. See note 7, *supra.*

maintains in July of 1981, plaintiff accepted defendant's position that a showing of actual economic hardship was necessary before price relief was warranted. According to defendant, plaintiff attempted to demonstrate actual hardship and failed, after which time plaintiff continued to order coal, accepted price escalations, and never advanced the argument that a 30% rise in the Consumer Price Index alone mandated price relief under Section 8(c)(ii). On the basis of these same facts, which are disputed by plaintiff, defendant contends that waiver and estoppel bar plaintiff from asserting its interpretation of the contract three and one-half years after the alleged breach.

Defendant has not moved for summary judgment on plaintiff's breach of contract claim or on defendant's affirmative defenses of waiver, estoppel and mitigation of damages. The validity of these affirmative defenses has no bearing on the interpretation of the rights of the parties under the language of the contract. Having concluded that the contract between the parties is ambiguous on its face, and that the only extrinsic evidence submitted by plaintiff on this claim is not properly before the court, I need not address defendant's extrinsic evidence or the inferences drawn from it. In view of the ambiguity of the contract, it would be improper to dispose of plaintiff's breach of contract claim without the benefit of a complete picture of the extrinsic evidence as presented by both parties. *See Davis v. Chevy Chase Financial, Ltd.*, 667 F.2d 160, 170 (D.C.Cir.1981). Accordingly, I will deny plaintiff's motion for summary judgment on its claim that the contract required the defendant to adjust the contract price after the Consumer Price Index rose 30% from its October 1974 level, the parties agreed to renegotiate the contract price but failed to reach an agreement after 180 days, and the seller chose to continue supplying coal.

*Applicability of Uniform Commercial Code Section 2–305*

■ Plaintiff next argues that by refusing to adjust the contract price, defendant breached not only his contractual duty but the duty of good faith imposed by Section 2–305 of the Uniform Commercial Code (UCC).

Section 2–305 of the UCC, as adopted by the State of Indiana, provides

(1) The parties if they so intend can conclude a contract for sale even though the price is not settled. In such a case the price is a reasonable price at the time for delivery if

(a) nothing is said as to price; or

(b) the price is left to be agreed by the parties and they fail to agree; or

(c) the price is to be fixed in terms of agreed market or other standard as set or recorded by a third person or agency and it is not so recorded.

(2) A price to be fixed by the seller or by the buyer means a price for him to fix in good faith.

Indiana Code § 26–1–2–305(1) and (2).

Plaintiff maintains that the circumstances of this case may be viewed either under § 2–305(1)(b) as a situation in which the parties failed to agree on a price, or under § 2–305(2) as situation in which the seller failed to fix the price in good faith. Under either scenario, plaintiff argues that the contract price became unsettled when plaintiff requested price renegotiations on March 13, 1981; that defendant forfeited its right to set a new price by refusing to negotiate; and that a reasonable price should be determined by the court.

It is questionable whether the open price term provisions of UCC § 2–305 apply to the contract at issue in this case. The contract between plaintiff and defendant was not one in which a price term was left open upon the making of the agreement. Instead, the contract set a definite price subject to revision under two separate schemes: the price adjustment mechanisms of Section 7 and the renegotiation provisions of Section 8. Under normal circumstances, a contract that sets prices according to a detailed price adjustment mechanism tied to specific cost factors does not implicate the open price provisions of UCC § 2–305. However, certain events during the term of a price adjustment contract may operate to unsettle the contract price.

In support of its contention that UCC § 2–305 applies at any phase of a price adjustment contract when the price becomes unsettled, plaintiff cites *North Central Airlines v. Continental Oil Co.*, 574 F.2d 582 (D.C.Cir.1978), a case in which the imposition of federal price controls rendered inapplicable the price escalation clause of a long term fuel contract. After the contract in that case was executed, the Federal Cost of Living Council set two-tier prices for "old oil" and "new oil." The Court of Appeals for the District of Columbia concluded that the contract's price escalation clause was too indefinite to apply to a system of two-tier pricing, and directed the district court on remand to determine the reasonable price of aviation fuel. 574 F.2d at 592–593.

Plaintiff does not suggest that external events made it impossible for the price adjustment mechanism of its contract with defendant to set a price for coal. From plaintiff's renegotiation request to the present time, Section 7 of the contract has continued to furnish a price and plaintiff has agreed to pay it. Instead, plaintiff suggests that the price determined by the adjustment mechanism became open for discussion when the Consumer Price Index increased by thirty percent.

Although § 2–305 of the UCC may be said to apply in certain situations during the life of a long-term price adjustment contract, I am not persuaded by plaintiff's argument that its renegotiation request rendered the price of coal open within the meaning of UCC § 2–305. As noted above, although the contract requires the parties to renegotiate, it does not require them to reach an agreement. The contract specifically provides for the possibility that the parties may fail to reach an agreement. One of the potential outcomes under Section 8(c)(ii) of the contract is for the seller to continue supplying coal under the terms of the contract without any revision in price. Having concluded that the contract is ambiguous with respect to the seller's duty to adjust the price after price negotiations have failed and the seller has decided to continue supplying coal, I am unable to determine that the price became open or that the defendant breached a duty to set a reasonable price.

Absent an truly open price or a clear contractual duty on the part of the seller to provide price relief upon the buyer's claim of economic hardship, it I conclude that the provisions of UCC § 2–305 do not impose upon the defendant an independent duty to adjust the contract price in good faith.

*Market price*

As it is unclear whether defendant was under an obligation to provide price relief to plaintiff, it is premature to determine whether the market price is a reasonable price.

### Claim Four: Unconscionability

In its fourth claim, plaintiff alleges that the price and economic hardship provisions of the contract are unconscionable under Section 2–302 of the Uniform Commercial Code.[9] More specifically, the complaint alleges that:

Due to circumstances beyond its control, plaintiff lacked a meaningful choice in connection with its decision to enter into the Contract and accept the Contract's terms and conditions, and as a consequence, defendant failed and refused to meaningfully negotiate the terms and provisions of the Contract with plaintiff. By reason of plaintiff's lack of meaningful choice and defendant's insistence upon harsh, oppressive and unconscionable contract provisions, plaintiff ... alleges that the Contract as a whole is oppressive, unconscionable and unenforceable by defendant against plaintiff.

---

9. In response to defendant's motion for summary judgment, plaintiff states that its unconscionability claim is based upon the productivity table, laws compliance and materials and supplies provisions of the contract, which allow defendant to "overrecover" actual cost changes contrary to the intent of Section 7(a) of the contract. In its proposed findings of fact, plaintiff describes defendant's administration of these clauses during the life of the contract. For reasons described below, I conclude that these facts are not relevant to the question whether plaintiff's unconscionability claim is barred by the statute of limitations.

Defendant contends that plaintiff's unconscionability claim is barred by the statute of limitations and by the doctrine of laches.

Although the contract specifies that Indiana law shall govern the substantive application of the contract, the parties agree that Wisconsin law determines the statute of limitations. *See Air Products and Chemicals, Inc. v. Fairbanks Morse, Inc.*, 58 Wis.2d 193, 206 N.W.2d 414 (1973). Defendant contends that the plaintiff's unconscionability claim is barred under either Wis.Stat. § 893.43 (six-year limitations period for actions upon a contract) or under Wis.Stat. § 893.93(1)(b) (six-year limitations period for actions based on fraud). Plaintiff argues that that the ten-year limitations period of Wis.Stat. § 893.18(4) (1977) applies. Section 893.18(4) (1977) provides:

> Within ten years:
>
> (4) An action which, on and before February 28, 1857, was cognizable by the court of chancery, when no other limitation is prescribed in this chapter.

Although § 893.18(4) was repealed in 1979 when the Wisconsin legislature undertook an extensive revision of the statute of limitations, 1979 Wis.Laws ch. 323, § 28, the ten-year limitations period remains in effect for causes of action that accrued prior to its repeal. Wis.Stat. § 990.06.

Plaintiff has provided no direct support for its assertion that a chancery court prior to 1857 would have recognized an action for contract reformation based on oppressive terms and lack of meaningful choice. Plaintiff cites *Langer v. Stegerwald Lumber Co.*, 262 Wis. 383, 389, 55 N.W.2d 389 *reh'g denied*, 262 Wis. 391a (1956), for the more general proposition that an action to reform a written instrument was cognizable by a court of chancery before 1857. In that case, which involved the reformation of a lease agreement on the basis of mutual mistake, the Wisconsin supreme court rejected the six-year statute of limitations for contract actions in favor of the ten-year statute of limitations under Wis.Stat. § 330.18(4), the predecessor of § 893.18(4). Nothing in *Langer* suggests that a chancery court would have recognized an action

for reformation on the grounds asserted in the present case.

The use of the word "action" in Section 893.18(4) refers to the existence of a remediable right rather than the availability of a particular form of remedy. *Cf. Ott v. Hood*, 152 Wis. 97, 103, 139 N.W. 762 (1913). To invoke the longer limitations period of § 893.18(4), it is not enough for plaintiff to show that the equitable remedies of reformation and rescission were available for other causes of action prior to 1857. Instead, plaintiff must show that a court of chancery at that time would have provided equitable relief on the particular grounds asserted in this case. Plaintiff has failed to do so.

Unconscionability is a general term embracing fraud and misrepresentation as well as gross inequality or oppressiveness of contractual terms. *Kerr McGee Corporation v. Nothern Utilities*, 673 F.2d 323, 328 (10th Cir.1982); Calamari and Perillo, *Contracts* at 325–326 (1977). Plaintiff suggests that the equitable remedies of rescission and reformation were traditionally available in cases of fraud or misrepresentation, but makes no showing that such actions were recognized before 1857. Moreover, plaintiff does not allege fraud or misrepresentation; only that it had no meaningful choice in entering into a contract the terms of which were harsh and oppressive. Plaintiff cannot avail itself of the benefits of a longer limitations period through an assertion that the general term "unconscionability" embraces wrongs about which plaintiff does not complain.

Plaintiff asserts that Indiana law recognized the equitable powers of a court to rescind a grossly unfair contract even before the adoption of the Uniform Commercial Code in 1961. *See Franklin Fire Insurance Company v. Noll*, 115 Ind.App. 289, 58 N.E.2d 947 (1945); *Stiefler v. McCullough*, 97 Ind.App. 123, 174 N.E. 823 (1933). However, plaintiff cites no case prior to 1933 in which oppressive contractual terms were the basis for a court's decision to rescind a contract.

I conclude that the applicable statute of limitations in this case is the six-year stat-

ute for actions upon a contract, Wis.Stat. § 893.43. The statute of limitations for actions based upon fraud, § 893.93(1)(b), is inappropriate in this case. This is not a tort action for damages based upon allegations of fraudulent misrepresentation by the defendant, but an action upon a contract seeking rescission or reformation of certain onerous terms. In its response to defendant's motion for summary judgment, plaintiff asserts for the first time that defendant intended from the very beginning to "overrecover" costs under the contract, despite its representations to the contrary. Plaintiff asserts that it was in no position to discover "the facts constituting the fraud," Wis.Stat. § 893.93(1)(b), until years later when deliveries of coal began and Dairyland had an opportunity to observe defendant's administration of the cost recovery provisions of the contract. Fraud does not form the gravamen of plaintiff's complaint. Instead, plaintiff's suggestion of fraud appears to be an afterthought motivated by the need to rescue its unconscionability claim from the statute of limitations. Under such circumstances, Wis. Stat. § 893.93(1)(b) is inapplicable. *Peters v. Kell,* 12 Wis.2d 32, 106 N.W.2d 407 (1961).

■ Under the express language of UCC § 2–302, unconscionability of a contract is determined at the time the contract is made, not at some later time:

(1) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable *at the time it was made* the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

(Emphasis added).

The official comment to UCC § 2–302 further states that

[t]he basic test is whether, in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing *at the time of the making of the contract.*

(Emphasis added). *See also Kerr McGee Corp. v. Northern Utilities,* 673 F.2d 323 at 328. This contract was entered into in 1974. The complaint was filed in 1984, nine years later. Plaintiff's unconscionability claim is barred by the six-year statute of limitations under Wis.Stat. § 893.43.

Having found that plaintiff's unconscionability claim is barred by the applicable statute of limitations, I need not address defendant's contention that the claim is also barred by the doctrine of laches.

### Claim Five: Price Discrimination Under the Robinson–Patman Act

■ The Robinson–Patman Act provides, in pertinent part, that

It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality ...

15 U.S.C. § 13(a). To state a claim under 15 U.S.C. § 13(a), the plaintiff must show that a seller made contemporaneous sales of a commodity to competing purchasers on price terms that favored one competitor over another, *Bruce's Juices v. American Can Co.,* 330 U.S. 743, 755, 67 S.Ct. 1015, 1620, 91 L.Ed. 1219 (1947); *Rutledge v. Electric Hose & Rubber Co.,* 511 F.2d 668 (9th Cir.1975); *Texas Gulf Sulfur v. J.R. Simplot Co.,* 418 F.2d 793, 806–807 (9th Cir.1969); and that the sales had the effect of lessening competition. *Whitaker Cable Corp. v. FTC,* 239 F.3d 253 (7th Cir.1956).[10] In evaluating the legitimacy under the Robinson–Patman Act of prices charged under a long-term supply agreement, a court must look to the terms of the contract at

---

**10.** Defendant does not concede that Interstate Power, Iowa Power & Light, and Wisconsin Power & Light are plaintiff's competitors. Apart from its general allegations, plaintiff has not made a detailed showing that it competes with these utilities. As I find that plaintiff's Robinson–Patman Act claim is defective for other reasons, I need not address this issue.

**994**

the time of its execution. *Texas Gulf Sulfur* at 805–806.

Plaintiff does not argue that the price terms of its original contract with defendant are discriminatory. Instead, plaintiff bases its price discrimination claim upon defendant's refusal to adjust the contract price of coal in July, 1981, at which time defendant was selling coal to plaintiff's alleged competitors at substantially lower prices. Assuming the validity of its argument that defendant was under a contractual obligation to lower the contract price of coal to a reasonable level once plaintiff had claimed economic hardship and attempts to renegotiate the contract price had failed, plaintiff contends that defendant acted discriminatorily in refusing to bring Dairyland's price in line with that of its competitors. Plaintiff maintains that the date of its original contract with defendant is no longer relevant to the question whether contemporaneous sales occurred because the contract price became open in July, 1981, when plaintiff invoked the hardship and renegotiation provisions of the contract. According to plaintiff, defendant's refusal to reduce Dairyland's price was contemporaneous with the October 1981 negotiations during which defendant agreed to reduce its coal price to Wisconsin Power & Light, and the higher prices charged to plaintiff after July, 1981 were a direct result of defendant's breach of its duty to adjust the price to Dairyland.

Plaintiff's arguments are unpersuasive. As noted above, there remain substantial questions about the validity of plaintiff's contractual interpretation. I have already rejected plaintiff's contention that the contract price for coal under the Dairyland contract became open upon plaintiff's request for price renegotiation. It remains to be determined at trial whether defendant was under an obligation to make a determination of actual economic hardship and what measure of price relief would have been appropriate had such a determination been made. As defendant argues, even if Amax were required to grant Dairyland price relief in July, 1981, there would be no basis for a finding of contemporaneous sales within the meaning of the Robinson–Patman Act. The allegedly discriminatory prices charged to plaintiff after July, 1981, were set according to the terms of a contract entered into in 1975. Sales of coal at these prices in 1981 can not be said to have become new sales because the seller has breached a duty to adjust the contract price. Plaintiff does not cite a single case in support of its contention that sales made under a long-term contract in breach of a contractual duty to provide price relief are contemporaneous with sales made by the seller under other long term contracts or amendments thereto. My research has produced no case that would support such a proposition. Accordingly, I conclude that defendant is entitled to summary judgment on plaintiff's price discrimination claim.

### ORDER

IT IS ORDERED (1) that plaintiff's motion for summary judgment on its second claim is GRANTED with respect to that portion of the claim that alleges defendant breached its contractual duty to renegotiate the price of coal and DENIED in all other respects;

(2) that defendant's motion for summary judgment with respect to the fourth and fifth counts of the complaint is GRANTED.